# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | |
|---|---|
| GORDEN B. GRAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 5:12-cv-29 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Gorden B. Gray ("Gray") filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), finding him not disabled and therefore ineligible for both supplemental security income ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, ("Act"), 42 U.S.C. §§ 401-433; 1381-1383f.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed the issues, and neither party has requested that a hearing be held. Gray asserts a single issue in this appeal; namely, that the ALJ erred by finding that if Gray stopped abusing alcohol, he retained the residual functional capacity to engage in certain level of substantial gainful activity. As such the ALJ concluded that Gray was not disabled. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law, and conclude that substantial evidence supports the ALJ's decision. As such, **I RECOMMEND DENYING** Plaintiff's motion for

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

summary judgment, Dkt. 14, and **RECOMMEND GRANTING** the Commissioner's motion for summary judgment, Dkt. 16.

I. STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Gray failed to demonstrate that he was disabled under the Act. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Gray bears the burden of proving that he is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)(2006)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2) and 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[2] (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

In cases in which there is medical evidence of a substance use disorder, like there is in this case, the ALJ must also evaluate whether the substance use disorder is a contributing factor material to the determination of disability. 42 U.S.C. § 432(d)(2)(c); 42 U.S.C. § 1382c(a)(3)(J) This analysis is required because the Act "prohibit[s] the award of DIB and SSI to individuals disabled by alcoholism or drug addiction." Mitchell v. Comm'r of the Social Sec. Admin., 182 F.3d 272, 273, 274 (4th Cir. 1999). In Mitchell, which rejected an equal protection challenge to the provision by an alcoholic, the Fourth Circuit explained that the "implementing regulations specify that alcoholism . . . is a contributing factor [to a claimant's disability]. . . if an individual

---

[2] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

3

would not be disabled if he stopped using alcohol . . . ." Id. at 274 n.2 (citing 20 C.F.R. §§ 404.1535(b), 416.935(b) (1998). However, "a person who suffers from disabling impairments unrelated to alcoholism . . . is not prevented from receiving benefits." Mitchell, 182 F.3d at 274 n.2 (citing 20 C.F.R. §§ 404.1535(b), 416.935(b)). The "key factor" is whether the applicant would still be disabled if he "stopped using . . . alcohol." 20 C.F.R. § 404.1535(b).

## II.    STATEMENT OF FACTS

### A.    Social and Vocational History

Gray was born on July 30, 1974, Administrative Record (hereinafter "R.") 37 and, at all relevant times in these proceedings, has been a "younger person" under the Act. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2011). Gray attended school until the eighth grade, and cannot read or write. R. 37. He was in special education classes during his time in school. R. 52. Gray's past relevant work includes employment before 2007 in the construction field (medium, semi-skilled), as a farm laborer (heavy, unskilled), as a forklift operator (light, semi-skilled), as a machine operator (light, unskilled), and as a door manufacturing production worker (medium, unskilled). R. 51. After his alleged onset disability date of April 14, 2007, Gray tried to work for himself doing remodeling, earning about $3,000 in 2007. R. 38-39. He also worked in 2009 for a temporary agency for about a month, until he sustained a wrist injury. R. 38-39, 44-45.

### B.    Claim History

Gray filed for SSI and DIB on November 19, 2009, R. 17, and both applications contend that he became disabled on April 14, 2007. In his initial applications, Gray claimed impairments of "migraines and right knee problems." R. 161; see also R. 20 (ALJ concluding that Gray has "a wrist impairment, a knee impairment, borderline intellectual functioning and an alcohol abuse

4

disorder"). At the August 24, 2010 hearing before the ALJ, Gray testified that he has frequent, bad migraines. He said he gets them three to four times a week, and that two of those weekly are so severe that he is unable to sleep and has "to go to the hospital to get shots for them." R. 38, 40. Gray testified he takes Butalbital for his migraines, and that he missed work about two to three days per week because of his migraines and got in trouble because of his absences when he worked at the temporary agency in 2009. R. 45-46. Gray claimed that he has problems with both his right hip and leg and the lower part of his back. He also explained that he has ADHD and is bipolar, that people make fun of him because he cannot and read and write, and that he "can't hold it in" when people make fun of him, in an apparent reference to his anger or temper. R. 39.

With regard to his alcohol use, Gray told the ALJ that he quit drinking "about two or three years ago [which would have been either around August 24, 2007 or August 24, 2008]." R. 46.[3] He told the ALJ that his headaches had gotten worse since he quit drinking. Id. At the time of the hearing, he had not seen a neurologist about his headaches, but had an appointment the following month to see a doctor about them. He later submitted those medical records to the ALJ. R. 47.

The state agency denied his application at the initial and reconsideration levels of administrative review. R. 75-80, 85-98. On August 24, 2010, ALJ Thomas R. King held a hearing to consider Gray's applications. Gray was represented by counsel at the hearing, Thomas Lane,[4] and the ALJ heard testimony both from Gray and from a vocational expert, Barry S. Hensley, Ed. D. See R. 33-54 (transcript of hearing); see also R. 136-38 (resume of Mr.

---

[3] As is discussed in more detail infra at Section III-A, Gray's statement that he had stopped drinking in either August 2007 or August 2008 is belied by a number of medical records and his own statements to medical professionals reflecting that he continued to use alcohol after those dates.

[4] At some point after the hearing and before filing in federal court, Gray reported that Mr. Lane had died unexpectedly. R. 4. Gray is represented in this case by new counsel.

Hensley). At the conclusion of the hearing, the ALJ agreed to keep open the case for one month to give Gray the opportunity to present any medical evidence from the neurologist he was about to see regarding his headaches.

On November 23, 2010, the ALJ entered his decision denying Gray's claims for DIB and SSI. R. 17-32. The ALJ found that Gray suffered from the following severe impairments: a wrist impairment, a knee impairment, borderline intellectual functioning and an alcohol abuse disorder. R. 20. The ALJ also found that Gray "alleges migraine headaches, but no medical source of record has indicated that the claimant would have any work-related limitations of function because of his migraine headaches." Thus, the ALJ found that Gray's migraine headaches were a non-severe impairment, and in doing so noted that "they may be related to his abuse of alcohol." R. 20. At the third step, the ALJ found that Gray's impairments did not meet a medical listing. Id.

Considering Gray's impairments, the ALJ found that he was unable to perform any past relevant work, regardless of whether he stops his alcohol abuse or not. R. 21, 31. The ALJ also concluded that there were no jobs that Gray could perform based on all of his impairments, including the substance use disorder. R. 21. The ALJ concluded, however, that if Gray stopped drinking, Gray retained the residual functional capacity to perform light work, except that he would be limited to simple, unskilled work and could not perform any work that requires reading or writing. R. 22. Based on the vocational expert's testimony, the ALJ found that, if Gray stopped the substance use, there would be a significant number of jobs in the national economy that Gray could perform. R. 31. Thus, he concluded that Gray's substance use disorder was a contributing factor material to the determination of disability and that Gray was not disabled.

R. 32.

On March 13, 2012, the Appeals Council denied Gray's request for review. R. 6-9. The Appeals Council's decision included a list of documents that Gray had presented as new evidence and which were made part of the record, R. 10, but review was nonetheless denied. This appeal followed.

### C. Medical Evidence

The record contains a number of medical records from 2004 and 2005 reflecting that Gray sought treatment (primarily at the emergency room of Rockingham Memorial Hospital ("RMH")) for a variety of ailments, including headaches, chest pain, abdominal pain, pain in his left elbow, right knee pain, and a sore throat. R. 355, 533, 764-785, 789-816, 840-45. An evaluation conducted by the University of Virginia Health System in December 2004 stated that Gray had "cognitive concerns secondary to multiple mild head injuries and likely substance abuse. He currently meets criteria for Alcohol Dependence with Physiological Dependence, provisional Post Concussive Disorder, and Substance Induced Mood Disorder with Depressive Features." R. 533. Gray apparently reported during that evaluation that he had threatened suicide several times in the past, but that he had "no serious suicidal ideation when sober." He reported at that time that he "drinks a ½ gallon of Jack Daniels every three days or up to 12 beers per day," that he had "[l]egal problems related to drinking[,] includ[ing] DUI [and] 3 charges for assaulting his wife." Id. He had been "court-mandated to attend alcohol education after the DUI. He attended one AA meeting but it was 'not for him.' He denied a current need to stop drinking and noted that it was only harming himself." Id.

From 2006 to 2009, he continued to make repeated visits to the ER at RMH, again for a

7

variety of symptoms and ailments, including testicular pain, right knee pain, a swollen tattoo, a snake bite, vomiting, chest pain, ear ache, left elbow pain, bronchitis, and shortness of breath. See generally R. 357-82, 425-512, 547-816. Indeed, the medical records reflect that the ER staff was quite familiar with him. See, e.g., R. 375 (notation on July 9, 2007 that he had been seen here "multiple times, 32 times[,]" "has had multiple altercations" and "seems to be fairly hyperaggressive"); R. 494 (notation on July 17, 2007 that he had "33 visits to our emergency department in the last 4 years"); R. 646-47 (May 25, 2008 notation that "[a]s always, [Gray] wants pain medicine. He gets lots of narcotics here."); R. 589-90 (November 20, 2008 notation that Gray "has become very well known to the emergency department. This is his fifty-seventh visit to the emergency room" and also noting a "strong concern for narcotic-seeking behavior.") Until his wrist injury in 2009, discussed below, none of these medical records include any lasting restriction on Gray's ability to work. Additionally, examinations, CT scans and MRI studies all revealed consistently normal results. He underwent a cardiac catheterization in January 2008 after experiencing shortness of breath during a stress test, and that procedure revealed "no significant coronary artery disease." R. 680. The typical treatment response, if any, to his complaints, was either to prescribe medicine or recommend other similarly conservative treatments.

There are additional records from Page Memorial Hospital in 2010, including visits where Gray complained about high blood pressure, shoulder pain, chest pain, and follow-up on his left wrist. R. 945-48, 966-75, 976-83, 949-51. Again, no significant abnormalities were discovered, nor did he receive extensive treatment. See generally id.

In October 2009, Plaintiff received treatment from R. David Lee, M.D. for a wrist injury

8

that occurred while Plaintiff worked on a door press. Gray was able to move all of his fingers and rotate his thumbs without difficulty, and could fully rotate his left wrist, but his grip was slightly decreased on the left and he exhibited mild pain on palpation. R. 544. Dr. Lee diagnosed him with a left wrist sprain, after his xray was "unremarkable[,]" prescribed ibuprofen and encouraged him to use ice or heat to help with the pain. Id. Dr. Lee also placed him on work restrictions, including instructions to avoid strong gripping with his left hand, to avoid lifting anything solely with his left hand, and to avoid lifting anything greater than thirty pounds with both hands. Id. On October 26, 2009, Gray told Dr. Lee that he was sent home from work because his employer did not have any jobs that could accommodate those restrictions. R. 542. Gray then attended physical therapy and did home exercises, which he admitted he benefitted from. R. 538. He continued with physical therapy off and on through July 2010 and there were repeated notes that his wrist function improved as a result of the therapy. See, e.g., R. 876-888.

On March 17, 2010, at the request of the Administrative Law Judge, Gray underwent a consultative examination by Joseph J. Cianciolo, PhD, a licensed clinical psychologist. Dr. Cianciolo both examined Gray and reviewed his prior medical records. See R. 861-65 (report); R. 28-30 (ALJ discussing Dr. Cianciolo's report in detail). As relevant here, Dr. Cianciolo listed his diagnostic impressions as including "alcohol dependence, partial sustained remission," "anxiety disorder, NOS," "borderline intellectual functioning" and "migraine headache s/p multiple episodes of concussion." R. 863. Dr. Cianciolo further noted that Plaintiff could perform activities of daily living without assistance and perform routine household tasks. R. 861. He stated that Plaintiff's intelligence was in the "borderline range," that his insight and judgment

9

were commensurate with his intelligence and that Plaintiff's GAF score was a 65,[5] which indicates "[s]ome mild symptoms OR some difficulty in social occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." R. 862-863. Dr. Cianciolo further found that Plaintiff would experience only mild impairment in his ability to maintain regular attendance in the workplace, to perform work activities on a consistent basis, to complete a normal workday or workweek, to interact with coworkers and the public, and to cope with routine stressors encountered in competitive work. R. 863. Dr. Cianciolo noted that he "would defer to [Gray's] physician" "as to what effect if any, his medical condition would have upon these abilities." Id.

After the hearing before the ALJ, but before the ALJ issued his decision, Gray also submitted two sets of medical records related to his complaints of migraine headaches. R 984-1027. The first set of records, which the ALJ referenced briefly in his decision (see R. 31 (citing to Exhibit 22F), reflect that Gray made two visits to the Emergency Room at RMH on August 4 and 5, 2010 complaining of a headache. On August 4, 2010, he received a negative CT scan and a negative lumbar puncture (after an initial lumbar puncture attempt that was aborted and a spinal MRI confirmed "no epidural hematoma"). R. 987, 996-99. On August 5, 2010, he returned to the ER because of a headache. After examining him, the treating physician concluded, "[i]t appears that this is a migraine versus a post [Lumbar Puncture] headaches. Nevertheless, I will be treating him with Toradol, Compazine, Benadryl, Decadron intravenously as well as 1L of fluids." R. 987. Later, when the doctor when to check on him, he reported that Gray "was asleep" and Gray "said that his head was no longer bothering him." R. 988. He had a

---

[5] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning and considers the psychological, social, and occupational functioning of an individual on a hypothetical continuum of 1 to 100. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Rev. 2000), with 100 being the most high-functioning.

"continued normal neurological exam." Id. He was discharged and advised to see his physician for any new or unexplained symptoms. Id.

The second set of records reflect treatment Gray received from RMH Neurology from August 16, 2010 through November 17, 2010. R. 1010-1027, which consisted of a referral document dated August 16, 2010, and three visits—on September 28, 2010, October 27, 2010, and November 17, 2010. On two of these visits, he was treated with a nerve block procedure. R. 1013, 1015. Otherwise, he was prescribed Depakote as a preventative measure and Replax as an "abortive agent." R. 1022-23. He was also advised to maintain a headache diary, to increase his oral fluids and decrease caffeinated beverages and to maintain a regular sleep schedule. R. 1022-23. Notably, none of the records contain any functional limitations imposed by any physician as a result of his migraines.

### III. ANALYSIS

In his motion for summary judgment, Gray contends that the issue before the court is "[w]hether substantial evidence supports the Agency's 'finding that if the Plaintiff stopped the substance use he possessed the residual functional capacity to perform significant number of jobs in the national economy?'" Dkt. 15 at 2. Relatedly, Plaintiff argues that the ALJ erred in "dismissing the credibility of the Plaintiff and rejecting numerous medical reports" and in "not considering all the testimony" of the vocational expert. Id. at 3. In essence, Plaintiff argues that he credibly testified "he was suffering from migraines which eroded his unskilled occupational base to where the ALJ should have made a finding of disabled." Id. Defendant disagrees and instead insists that substantial evidence supports the ALJ's decision that Gray is not disabled.

**A. Substantial evidence supports the ALJ's determination that Plaintiff suffers from an impairment of alcohol abuse.**

Nowhere in his brief does Plaintiff argue that he does not suffer from an impairment of alcohol abuse. Because he makes a passing reference to his "**prior** substance use," Dkt. 15 at 5, however, I address first whether there was substantial evidence from which the ALJ could find that Gray continued to have an alcohol use disorder.

As an initial matter, there is substantial evidence in the record that Gray suffered from alcohol abuse in the past. As already discussed, medical records in the years prior to his alleged disability onset date refer to very heavy drinking, legal problems related to his drinking, and an unwillingness to obtain treatment. See R. 29 (referring to Dr. Cianciolo's summary of this information). These include repeated notations referring to alcohol consumption, a conviction for driving under the influence, and repeated assaults on his then-wife while drinking. R. 533 (discussing problems related to his drinking in 2004 and prior).

Similarly, there is substantial evidence to support that Gray continued to use alcohol after his alleged onset disability date. Indeed, Gray's statement to the ALJ that he stopped drinking "two or three years ago" (which would have been in either August 2007 or August 2008) is directly contradicted by numerous references in the record. These include his own statements to the consultative examiner, who Gray told, on March 17, 2010, that he had last drank beer two weeks prior. R. 681. They also include a number of other references to his drinking from 2007 to 2010. See, e.g., R. 388-89 (Gray reporting on January 10, 2008 that he "regularly could have 4-5 beers or perhaps mixed drink"), R. 429-38 (Gray reporting on January 11, 2008 that his average alcohol intake is greater than 12 beers a week and he claims he does not drink every day), R. 654 (referencing "drinking" and having fun that day, prior to his being attacked);

R. 642-45 (June 7, 2008 note by RMH that Gray had a "lateral gaze . . . consistent with alcohol or benzodiazepine/sedative hypnotic toxicity" and that he was removed from the emergency department by security after being extremely rude to staff and using multiple profane words); R. 904-09 (February 19, 2010 diagnosis of "acute alcohol and drug use" after Gray admitted "to alcoholic intoxication" and to "snorting Xanax Ultram and an unknown muscle relaxant); R. 1025 (Gray reporting, on September 27, 2010, that he currently drinks about 3 or 4 drinks per week).

Moreover, Gray was evasive about answering questions posed by the consultative psychologist, Joseph Cianciolo, regarding the amount of alcohol he consumes (or used to consume) and further told Cianciolo that he last "drank beer about two weeks ago." R. 861. Thus, substantial evidence supports the ALJ's determination that Gray continued to use alcohol.

### B. Substantial evidence supports the ALJ's determination that Plaintiff's subjective complaints about his migraines were not fully credible.

The only remaining question before the court, then, is whether substantial evidence supports the ALJ's decision that, if Gray stopped using alcohol, that he had the residual functional capacity to perform jobs available in significant numbers in the national economy. Gray argues that, even if he stopped drinking, his migraines prevented him from working because they are so painful that he cannot go to work on days when he has bad ones, and that this occurs several times per week. He relies on the testimony of the vocational expert from the hearing, who found that to perform the jobs he listed (hand packers, assemblers, and production inspectors) an employee cannot miss "more than a day a month or so." R. 53.

In his decision, the ALJ first determined, in accordance with Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996), that Plaintiff's impairments could reasonably be expected to

13

produce the symptoms which he alleged. R. 24. But after considering the medical evidence and other evidence of record, the ALJ determined that Gray's "statements concerning the intensity, persistence and limiting effects" of his symptoms from his migraines "are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . ." Id.

In reviewing this credibility finding, this court must employ a lenient standard of review, because it is the ALJ's task to determine the facts and resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). The ALJ must examine all of the evidence, including the objective medical record, and determine whether Gray met his burden of proving that he suffers from an underlying impairment which is reasonably expected to produce his claimed symptoms. Craig, 76 F.3d at 592-93. Notably, an ALJ may disregard a plaintiff's description of symptoms, as the ALJ did here, if that description does not comport with the objective medical evidence. Id. at 595. Moreover, a reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

Here, the ALJ's credibility determination is supported by the objective medical evidence. First, as to Gray's migraines, and as the agency contends, it appears that the treatment notes he submitted after the hearing "fail to support [his] subjective allegations." Dkt. 17 at 9. For example, the physical and neurological examinations revealed "normal results," see R. 1012-16,

1019-22. Additionally, the treatment he was given was generally quite conservative treatment. That is, he was prescribed pain medication, administered nerve blocks, and told to maintain a headache diary, increase oral fluids, decrease caffeinated beverages, and maintain a regular sleep schedule. R. 1022. As pointed out by the agency, "[t]hese sparse treatment notes and conservative treatment measures, and the fact that no physician opined that Plaintiff experienced functional limitations due to migraine pain, belie Plaintiff's allegations of disabling migraine pain." See Dkt. 17 at 9.

In addition to the specific objective evidence that undermines Gray's complaints of significant symptoms from his headaches, there is substantial evidence in the record to support the ALJ's determination that Gray was not generally credible. First, Plaintiff continued to work after his alleged onset disability date and there is evidence he tried to deceive the Agency regarding this fact. That is, during his intake interview, the intake officer noticed grease under his fingernails and asked him about it. He "admitted to taking tires off of car rims in exchange for tires and car parts" and that "he did this from time to time for Barry Hensley for car parts." R. 193.[6] The intake officer further noted that he was "very evasive when answering questions."

Moreover, Gray's repeated visits, in which he complained about a host of problems, generally resulted in findings that he was not suffering from any severe problem, after results to various tests came back normal. Also, ER staff expressed concern that Plaintiff was merely seeking narcotics. R. 589, 646. In short, while Gray did occasionally seek treatment for headaches over the years, he also sought treatment for a variety of other ailments which, as the ALJ summarized, were visits for "various complaints for which there is little if any evidence of

---

[6] As best I can tell, the Barry Hensley referred to by the intake employee is a used car dealer in Elkton, Virginia (business name being Street Machines LTD) and is not the same person as Barry Hensley, the vocational expert in this case, who is the Founder and director of Educational Services Institute in Harrisonburg, Virginia. (R. 136.) At the hearing, VE Hensley denied under oath knowing Gray. R. 51.

anything wrong with him." R. 31.  Gray's general credibility is also undermined by his inconsistent reports regarding his alcohol use. See supra at 11-12 (discussing various references in the medical record to alcohol use or abuse after the date when he told the ALJ he had stopped drinking).

For these reasons, there is substantial evidence to support the ALJ's determinations both that Gray abuses alcohol and that his headaches and other impairments would not render him disabled, if he stopped using alcohol.  Accordingly, substantial evidence supports the ALJ's determination that Gray is not disabled. Blankenship v. Astrue, 635 F. Supp. 2d 447, 452 (W.D. Va. 2009) (affirming ALJ's denial of benefits to Plaintiff who "engage[d] in regular and excessive use of alcohol"; although the record showed she was not "free of nonalcohol related physical and mental problems[,]" there was substantial evidence to support the conclusion that her alcoholism was a contributing factor material to the disability evaluation).

## IV.   CONCLUSION

It is not the province of the court to make a disability determination. Instead, the court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence. Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (per curiam) finding that the reviewing court cannot make credibility determinations, but is empowered to review the ALJ's decision for substantial evidence).  In this case, substantial evidence supports the ALJ's opinion. In recommending that the final decision of the Commissioner be affirmed, I do not suggest that Gray is totally free from any distress.  It nonetheless appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Gray's claim for benefits and in determining that he suffered from an impairment of substance abuse and that, if he stopped using

alcohol, he would not be disabled. It follows that the Commissioner's decision in this case is supported by substantial evidence. Accordingly, I recommend that the Commissioner's decision be affirmed, Gray's motion for summary judgment, Dkt. 14, be **DENIED** and the defendant's motion for summary judgment, Dkt. 16, be **GRANTED**.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: August 14, 2013

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge